# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **MJ 26-65-M-KLD** |
| **Plaintiff,** | |
| **vs.** | **AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT** |
| **Cupid Lamar Drakeford** | |
| **Defendant.** | |

The undersigned, TFO Tyler Thornock, affiant being duly sworn states:

1.      I am a Task Force Officer (TFO) of the Federal Bureau of Investigation (FBI) and am currently assigned to the Montana Regional Violent Crimes Task Force (MRVCTF) in Missoula, Montana.  I have been employed as a law enforcement official for almost 8 years and in this time, I have had extensive training and experience in conducting criminal investigations, including criminal investigations related to illicit narcotics and firearms.  As a member of the FBI Montana Regional Violent Crime Task Force (MRVCTF), which specializes in targeting habitual violent offenders, dismantling violent criminal enterprises, and tracking fugitives, I have continued to expand on my training and experience into criminal investigations related to the aforementioned law enforcement activities. From early 2018 to late 2021, I served as a United States Border Patrol Agent for

in the Yuma Sector, Yuma Station, located in Yuma, Arizona. I, while employed as a Federal Agent, completed numerous investigations related to illicit narcotic distribution and trafficking in addition to other federal offenses. I also was assigned to and trained in the capacity of specialty teams and assignments to include the Targeted Enforcement Unit or TEU and a Counter-Small Unmanned Aerial System (CSUAS) Unit which was directly involved in disrupting and dismantling illicit narcotic trafficking operations. While employed as a Police Officer for the City of Missoula Police Department in Missoula, Montana I have successfully been selected and trained as a member of the Special Weapons and Tactics Team which involves assignments to maintain a high level of physical and mental performance while conducting activities to include high risk warrant service, tactical surveillance interdiction, as well as other emergency response roles.

2.    I am assigned to summarize herein that the information contained in this affidavit is based on my own observation, training, and experience as well as, where noted, information provided to me by other law enforcement officers.  I have not included all the facts known to me, but rather only those facts necessary to establish probable cause.

**3.**    Based on the facts set forth in this affidavit, there is probable cause to believe that Cupid Lamar Drakeford committed the crimes of 21 U.S.C. §

841(a) (possession with the intent to distribute controlled substances), and

21 U.S.C. § 846 (conspiracy to distribute controlled substances).

**PROBABLE CAUSE**

4.    I believe probable cause exists that Cupid Lamar Drakeford, AKA

"Q" has committed the crimes of 21 U.S.C. 846 Conspiracy to Distribute

Methamphetamine – 500 grams or more of a substance containing a detectable

amount of meth, a scheduled II controlled substance and 18 U.S.C. 922(G) Felon

in Possession of a Firearm.

5.    Montana Regional Violent Crimes Task Force began investigating Cupid

Lamar Drakeford, also known as "Q" for distributing methamphetamine and

fentanyl in the year 2025.  Drakeford resides at 1004 Toole Avenue in

Missoula, Montana, with his girlfriend Allison Stinger.  Drakeford lived in

an unattached garage on the Toole Avenue property, but recently it was

discovered that they reside in the main structure.  Stinger and Drakeford

reside approximately one block from Yokes and the Poverello Center.

6.    On February 7, 2025, a person who is a confidential source (CS), who is

known to law enforcement but wishes to remain anonymous for their own

personal safety and who will be referred to as CS1hereinafter. CSI who is

known to the Montana Regional Violent Crime Task Force (MRVCTF).

CS1 has provided information in the past that has been substantiated as

truthful and deemed reliable provided the following firsthand information. CS1 stated, Amy Veltkamp, Brandi Bishop, Lamar Drakeford ("Q"), Allison Stinger, and Brandon Clark are all dealing fentanyl and methamphetamine near Waverly and Toole Street in Missoula. CS1 knows the previously mentioned people are dealing because CS1 is a user of fentanyl.

7. On March 7, 2025, confidential source (CS2) provided firsthand information. CS2 is known to law enforcement but wishes to remain anonymous for their own personal safety and has provided information in the past that has been substantiated as truthful and deemed reliable. CS2 stated Stinger and a male named Rod had also resided in a camper trailer with Drakeford in the nearby area of a separate location involved in illicit narcotic activity. This was during the period when Stinger's mother was living and disallowed Drakeford and Stinger to reside at 1004 Toole Avenue. Following Stinger's mother's passing Drakeford and Stinger took occupancy at 1004 Toole Avenue full-time. Task Force Officer Shawn Heidrick believes Rod is Rodney Silsbee, who discharged two felony sentences in 2019. Silsbee was on felony probation for a Drug Offense in another state and Criminal Endangerment.

8. On May 13, 2025, a confidential source (CS3) provided firsthand information. CS3 is known to law enforcement but wishes to remain

anonymous for their own personal safety. CS3 has provided information in the past that has been substantiated as truthful and deemed reliable. CS3 stated their ex-partner was likely in Spokane, Washington, and was traveling back and forth distributing methamphetamine and fentanyl. CS3 stated that Drakeford used this individual as a source of supply. CS3 stated Drakeford was distributing the drugs in Missoula that Drakeford obtained from CS3's ex-partner. CS3 was in a relationship with the source of supply and overheard many conversations as well as being present during drug transactions.

9. Drakeford was known by CS3 to deal with both firearms and narcotics. CS3 personally observed Drakeford with a rifle and a pistol in August of 2024. CS3 stated they witnessed Drakeford with methamphetamine while possessing the firearms. Drakeford primarily dealt methamphetamine but also had numerous fentanyl pills and fentanyl powder in his possession which CS3 stated Drakeford would provide to his girlfriends. CS3 stated Drakeford always has girls around that help him with his criminal enterprise.

10. CS3 observed Drakeford with an ounce of methamphetamine and a "roll" of fentanyl pills, which is a slang term for 100 fentanyl pills, on a routine basis. CS3 stated when people in Missoula were looking for drugs, CS3 would drop them off by the Poverello Center or Yokes Grocery Store in Missoula

to meet up with Drakeford, which was Drakeford's common area to distribute methamphetamine and fentanyl. CS3 stated Drakeford was known to supply methamphetamine and fentanyl to people in this area because Drakeford lived close to the Poverello and Yokes but CS3 did not know Drakeford's home address.

11. On June 5, 2025, a cooperating source (CS4) provided firsthand information. CS4 is known to law enforcement but wishes to remain anonymous for their own personal safety. CS4 has provided information in the past that has been substantiated as truthful and deemed reliable. CS4 stated they used to be friends with Stinger. CS4 stated Stinger is always texting and inquiring about coming to Spokane, Washington, to pick up large amounts of fentanyl powder. CS4 stated Stinger never came to Spokane, which is where CS4 resides, to purchase any drugs. CS4 stated Stinger dates a black male who lives by the Poverello Center in Missoula or stays next to Stinger's mother's house in a garage.

12. On November 13, 2025, law enforcement stopped Jennifer Hawn. Hawn possessed approximately one-quarter pound of methamphetamine (113.28 grams). Hawn stated she was holding the methamphetamine for Drakeford. Hawn stated she was trying to make extra cash and Drakeford was using her

vehicle to store the drugs.    Other sources confirmed Drakeford uses other people to displace the quantity of illicit narcotics directly in his possession.

13.    The information regarding Drakeford dispersing narcotics amongst people and locations by Drakeford has been confirmed not only through the information related to the above incident with Jennifer, but through information provided through confidential human sources who recount that Drakeford uses other people to displace the amount of illicit narcotics directly in his possession.

14.    On December 16, 2025, a cooperating source (CS5), who is known to law enforcement but wishes to remain anonymous for their own personal safety provided information. CS5 who is known to the MRVCTF and has provided information in the past that has been substantiated as truthful and deemed reliable. CS5 has purchased methamphetamine in the past from a black male named Lamar Drakeford who goes by the name of "Q."  CS5 estimated conducting approximately ten transactions with Drakeford while working in a middleman capacity. The most methamphetamine CS5 seen at one time in Drakeford's possession was an 8-ball which is a common street term for 3.5 grams or 1/8 ounce. CS5 stated Drakeford dates a female named Allison Stinger and CS5 usually goes through Stinger to locate Drakeford and

provided the following phone number for Stinger, 406-499-2914. CS5 provided this information against their own best interest, which is indicative of honesty.

15. In late December 2025, a cooperating source (CS6) who is known to law enforcement but wishes to remain anonymous for their own personal safety provided information. CS6 who is known to the MRVCTF. CS6 has provided information in the past that has been substantiated as truthful and deemed reliable provided the following firsthand information. CS6 stated they purchased two to three points of fentanyl powder from a black male named Lamar Drakeford whose moniker is "Q." CS6 stated the purchase occurred in late December of 2025. CS6 provided this information against their own best interest, which is indicative of honesty.

16. MRVCTF TFO Tyler Thornock conducted surveillance of Drakeford's residence at 1004 Toole Avenue between December 31, 2025, and January 6, 2026. TFO Thornock observed activity that is synonymous with illicit narcotic activity. This includes, but is not limited to, an abundant amount of pedestrian and vehicular visits from multiple individuals who spend limited time at the residence before departing. During this time, he personally observed five known drug users visiting the residence.

17. TFO Thornock was informed that Stinger and Drakeford lived in the garage or shed but were now residing inside the main structure of the residence. TFO Thornock observed them entering and exiting the main structure multiple times from a doorway that faced north and is access from Waverly Street. This would typically be observed as the "back door" to the residence.

18. On December 31, 2025, TFO Thornock observed Alex Spencer arrive at the residence and depart as short time later.  Spencer is on state probation in Montana and is known to use methamphetamine.  Spencer was stopped by law enforcement after he left Drakeford's residence.  Spencer possessed approximately one "eightball" or approximately 3.54 grams of methamphetamine within a small sized baggie.

19. On January 23, 2026, Special Agent Monte Shaide and TFO Thornock spoke to Ben Fuqua near 1004 Toole Avenue.  Fuqua stated that an abundant amount of illicit activity is taking place at Drakeford's residence in the house and the shed, which Fuqua specifically motioned towards when speaking with law enforcement. Fuqua reported to law enforcement that the residence and shed are of a larger involvement with illicit activity than the area where he had been observed departing.

20. On January 28, 2026, David Fitzwilliams told Probation and Parole that he knows fentanyl is located at Stinger's residence but was unsure of the

amount. He additionally reported that Fitzwilliams was warned for testing positive for methamphetamine on January 27, 2026. Fitzwilliams' admission is seen as an attempt to distance himself from illicit activity, assist law enforcement, and become a better citizen and display good citizenship for his community.

21. On February 3, 2026, TFO Thornock and TFO Heidrick met with a Confidential Human Source who wished to remain anonymous. This individual will be referred to as CS7. The statements from CS7 were provided out of good citizenship and desire to assist law enforcement in the pursuit and disruption/dismantling of criminal actors. The CS7 knew a male who goes by the moniker "God." Law enforcement previously has identified "God" as Joshua Shipley. CS7 confirmed through a photo that the person they knew as God is Shipley. CS7 stated that God associates with a male by the name of Lamar Drakeford. The CS7 stated that they know that God and Drakeford are involved in the distribution of methamphetamine and fentanyl. The CS7 stated that this Josh individual is "creepy" and stated that he is involved in sexual activities. The CS7 reported that they know God to put fentanyl on or into female methamphetamine users' drugs as they used and purchased the methamphetamine. The CS7 reported that God and Drakeford purposefully don't inform the females that they are "lacing" or

"spiking" the narcotics in a desire to have the female drug user become unconscious or handicapped by the usage of fentanyl and then take sexual advantage of the females by sexually assaulting them. The CS7 expressed that God and Drakeford are known to "drug" females and expressed a belief that the two males are involved in criminal activity involving prostitution or similar illicit activity.

22. The CS7 stated that they did not know God to have firearms but stated they know Drakeford has firearms. The CS7 also stated that they know Drakeford will distribute narcotics to individuals in exchange for firearms. The CS7 stated Drakeford sold ounces or half ounces of methamphetamine for firearms in lieu of currency. The CS7 stated that they knew that individuals would use firearms, to include "hot" firearms, implying that the weapon was stolen or otherwise involved in criminal activity, as their form of payment to Drakeford.

23. Law enforcement also has received reports of Drakeford possessing firearms during his illicit activities and that Drakeford is known to individuals as someone who should not be crossed.

24. On March 10, 2026, Special Agent (SA) Kirk Lemmon conducted surveillance at 1004 Toole Ave, from approximately 12:50 p.m. until 4:45 p.m., and observed numerous people, most who appeared to be drug users,

entering and exiting the residence. At approximately 3:10 p.m., SA Lemmon observed two unidentified males leave the residence, one who SA Lemmon observed with a methamphetamine pipe in his hand.

25. On March 27, 2026, SA Lemmon conducted surveillance at 1004 Toole Ave from approximately 1:30 p.m. to 4:00 p.m., and observed numerous people, most who appeared to be drug users, entering and exiting the garage on the property. At one point, SA Lemmon observed Drakeford leave the residence, get on a bicycle and ride around the block in what appeared to be a systematic method, which SA Lemmon believed was a proactive, counter-surveillance tactic. Drakeford appeared to ride by and look into multiple vehicles in the surrounding area. SA Lemmon later observed another unidentified male arrive outside the residence on a bicycle and engage in a conversation on his cellular phone. SA Lemmon then observed the male look up the street and then ride his bike a block from 1004 Toole Ave, where shortly thereafter, SA Lemmon observed Drakeford on a bicycle enter the same parking lot the male with the bike had traveled to.

26. On April 3, 2026, a Confidential Source (CS), who wished to remain anonymous for their own personal safety and was deemed to be reliable by law enforcement, stated they were at Drakeford's residence on April 1, 2026. This CS will be referred to as CS8. CS8 observed drug paraphernalia

scattered throughout the residence, specifically in the living room. The paraphernalia consisted of items indicative of fentanyl and methamphetamine use to include tinfoil and bongs for smoking fentanyl powder and meth as well as plastic baggies containing residue.

27. On April 20, 2026, a search warrant was signed by the Honorable Kathleen L. DeSoto, United States Magistrate Judge. On the morning of April 23, 2026, at approximately 0433 hours, the Missoula Police Department was notified of an active drug overdose taking place at the residence of 1004 Toole Avenue. Patrol officers responded and found a female who was reported to be unconscious and bystanders were actively performing attempts at CPR while administering emergency Naloxone Hydrochloride or Narcan. Multiple rounds of CPR were completed and ultimately the female was transported via ambulance to St. Patrick's Hospital emergency medical treatment center.

28. Following the reported drug overdose call for service, of which I, TFO Thornock, had been made aware of and monitored, the MRVCTF began to mobilize for the execution of the Search Warrant. A search warrant service took place and Allison Stinger and Cupid Lamar Drakeford were located within the main residence of the property and another male was located inside the detached garage. Ultimately Allison Stinger was later released.

Cupid Lamar Drakeford was advised of his Miranda Rights, stated he understood his Miranda Rights, waived those rights, and spoke with Law enforcement.

29. Cupid Lamar Drakeford (AKA "Q") stated that over the last four years he had engaged in illicit narcotic activity. He stated that he used an average of 1-1.5 grams of methamphetamine daily for personal use and over the course of four years would engage in varying amounts of daily distribution from multiple grams to multiple ounces dependent upon his availability to source the illicit narcotic for distribution purposes. Drakeford self-reported that over four years, starting in approximately January 2022 he distributed approximately no less than a total low-end report of 5,638.72 grams of Methamphetamine, or 12.431 pounds, and with a high-end reporting of distributing approximately 9,087.44 grams of Methamphetamine, or 20.034 pounds. It is believed that based upon the information provided, Drakeford, was responsible for directly distributing large amounts of methamphetamine and openly stated that numerous other criminal actors were involved at the residence of which he and Allison resided, who were distributing narcotics in conjunction with Drakeford. Drakeford reported that he had engaged in illicit business activities of illicit narcotic or drug distribution with others who were invited into and allowed to reside at the property/residence with

Drakeford and engage in his activity described herein. This reporting by Drakeford was solely related to Methamphetamine. He reported that Allison Stinger is engaged in the Fentanyl Powder usage and any distribution of Fentanyl that takes place at the residence was outside of his control. Drakeford reported that he could not trust Allison and reported that he believed law enforcement had persons who were reported as "cops" or persons he could not trust that he believed had been engaging in activity designed to catch him in his illicit practices or assist law enforcement. Drakeford reported that he believed he was unable to trust any of the people who had been around him and stated that although Allison was his romantic partner or girlfriend that he could not trust her.

30. Drakeford reported that he had possessed multiple firearms over the course of his illicit narcotic distribution and possession. Drakeford reported that he had possessed a shotgun of which he provided detail of its unique nature as well as having been in possession of at least one pistol and two rifles. He also reported he was aware of and had possessed a rifle, which he described to law enforcement, and was located within the residence and seized pursuant to the search warrant execution.

31. Following the interview with Drakeford law enforcement spoke with a CHS, who will be described as CHS 9 and who spoke with law enforcement. The

CHS reported that a vehicle which was in the direct vicinity of the address of the search warrant was directly involved with the reported drug overdose and illicit activity taking place at the residence. This vehicle had been identified as such and seized by law enforcement pending a search warrant. There were also visible firearms within the vehicle from a plain view point of observation on the exterior of the vehicle. Information was provided that the vehicle was stolen from the general area of Pablo, Montana, after law enforcement investigation. The vehicle was "cold plated", or had a stolen license plate placed on the vehicle to further disguise it as being stolen. The vehicle was reported to contain multiple firearms which was consistent with law enforcement's independent observation. The firearms were reported to have been inside the residence prior to law enforcement arrival and the vehicle associated with the drug overdose and the overdose victim. CHS 9 reported that the firearms inside the truck were inside the residence at one point and that Drakeford was engaged in an attempted transaction regarding the firearms. It was reported that Drakeford was going to provide methamphetamine for the firearms as a form of currency. Information was provided that Drakeford was actively possessing methamphetamine at the time and "smoking out" or providing the substance to occupants of the residence. It was reported that these firearms and the illicit transaction for

methamphetamine was not completed prior to the drug overdose of the female. The truck was seized pending the approval of a search warrant.

32. The results of the search warrant resulted in the seizure of one firearm, a bolt action large caliber rifle, extensive amounts of items indicative of narcotic use, packaging, and distribution. A significant amount of firearm ammunition of various calibers, over one ounce of a white unknown substance that tested inconclusive on a substance test instrument known as the TruNarc instrument and will be sent to the DEA lab for further testing and evaluation, and various other smaller amounts of a substance observed to be consistent with the appearance of Methamphetamine.

33. Based on the information above, I believe probable cause exists that Cupid Lamar Drakeford committed the crimes of Title 21 United States Code, Section 841(a)(1), Possession with Intent to Distribute Controlled Substances as well as 21 United States Code, Section 846, Conspiracy to distribute controlled substances.

Tyler Thornock, Task Force Officer
Federal Bureau of Investigation

SUBCRIBED TO AND SWORN BEFORE ME this 24th day of April, 2026.

Hon. Kathleen L. DeSoto
United States Magistrate Judge
Missoula, Montana